## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **MARGARET ELIZABETH SEALES,** } | |
| } | |
| } | |
| **Plaintiff,** } | |
| } | **Case No.:  2:15-CV-02082-MHH** |
| **v.** } | |
| } | |
| **NANCY A. BERRYHILL,** } | |
| **Commissioner of the** } | |
| **Social Security Administration,** } | |
| } | |
| **Defendant.** } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. § 405(g), plaintiff Margaret Elizabeth Seales seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Seales's claim for a period of disability and disability insurance benefits.  After careful review, the Court affirms the Commissioner's decision.[1]

## I.    PROCEDURAL HISTORY

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. (*See* https://www.ssa.gov/agency/commissioner.html).  Therefore, the Court asks the Clerk to please substitute Ms. Berryhill for Carolyn W. Colvin as the defendant in this action.  *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending.  Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

Ms. Seales applied for a period of disability and disability insurance benefits on February 28, 2013. (Doc. 6-6, p. 2). Ms. Seales alleges that her disability began on May 20, 2012. (Doc. 6-6, p. 2). The Commissioner initially denied Ms. Seales's claim on April 23, 2013. (Doc. 6-5, p. 2). Ms. Seales requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-5, p. 7). The ALJ issued an unfavorable decision on August 7, 2014. (Doc. 6-3, pp. 58-71). On September 17, 2015, the Appeals Council declined Ms. Seales's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In making this evaluation, the Court may not "decide the facts anew,

reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If the ALJ's decision is supported by substantial evidence, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Seales has not engaged in substantial gainful activity since May 20, 2012, the alleged onset date. (Doc. 6-3, p. 63). The ALJ determined that Ms. Seales suffers from the following severe impairments: obesity, degenerative disc disease, fibromyalgia, diabetes, sleep apnea, right hip bursitis, and osteoarthritis of the knees. (Doc. 6-3, p. 63). The ALJ found that Ms. Seales suffers from the following non-severe impairments: osteopenia, left foot arthritis, trigger fingering, fecal incontinence, diabetic neuropathy, depressive disorder, and anxiety. (Doc. 6-3, p. 64). Based on a review of the medical evidence, the ALJ concluded that Ms. Seales does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 6-3, p. 66).

Based on Ms. Seales's impairments, the ALJ examined Ms. Seales's residual functional capacity. The ALJ determined that Ms. Seales has the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except she can stand/walk at most 4 hours per 8-hour day; can never climb ladders, ropes, or scaffolds; can occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs; can occasionally reach overhead bilaterally; can frequently engage in fine and gross manipulation bilaterally; must avoid all exposure to extreme vibration; and must have only occasional exposure to unprotected heights, use of hazardous machinery, and operational control of moving machinery.

(Doc. 6-3, p. 66). Based on this RFC, the ALJ concluded that Ms. Seales is able to perform her past relevant work as an assistant manager, courier, document specialist, and cafeteria worker. (Doc. 6-3, pp. 70-71). Accordingly, the ALJ determined that Ms. Seales has not been under a disability within the meaning of the Social Security Act. (Doc. 6-3, p. 71).

## IV. ANALYSIS

Ms. Seales argues that she is entitled to relief from the ALJ's decision because the ALJ failed to properly evaluate her subjective complaints of pain consistent with the Eleventh Circuit's three-part pain standard.

"To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Commissioner of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted). If an ALJ discredits a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons

for doing so." *Wilson*, 284 F.3d at 1225. "While an adequate credibility finding need not cite particular phrases or formulations[,] broad findings that a claimant lacked credibility . . . are not enough. . . ." *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995) (per curiam); *see* SSR 96-7p, 1996 WL 374186 at *2 ("The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.").[2]

During her administrative hearing, Ms. Seales testified that she stopped working because she has trouble "bending, lifting, [and] staying on [her] feet for a long period of time." (Doc. 6-3, p. 25). According to Ms. Seales, she cannot sit or stand for long periods of time, and lifting "puts a strain on [her] neck and on [her]

---

[2] On March 28, 2016, SSR 16-3p superseded SSR 96-7p. SSR 16-3p "provides guidance about how [the Social Security Administration] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." SSR 16-3p, 2016 WL 1119029 at *1. SSR-16-3p eliminates the term "credibility" from Social Security Administration policy and stresses that when evaluating a claimant's symptoms, an ALJ must "not assess an individual's overall character or truthfulness" but instead must "focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms." SSR 16-3p, 2016 WL 1119029 at *1, *10. SSR 16-3p does not apply retroactively to administrative decisions issued before March 28, 2016. *See Green v. Comm'r of Soc. Sec.*, --- Fed. Appx. ----, 2017 WL 3187048, *4 (11th Cir. July 27, 2017). In this case, the ALJ issued his decision on August 7, 2014, and the Appeals Council declined review on September 17, 2015. (Doc. 6-3, pp. 2, 58). Therefore, SSR 16-3p does not apply to Ms. Seales's appeal.

back." (Doc. 6-3, p. 25). Ms. Seales testified that she walks but is limited by neuropathy in her feet that causes stinging and swelling. (Doc. 6-3, p. 29). At home, when Ms. Seales finishes doing dishes, her back hurts and she has to take a pain pill and lie down. (Doc. 6-3, p. 30). Ms. Seales testified that she must shop for groceries slowly and that it typically takes two to three hours to complete her shopping because of her pain. (Doc. 6-3, pp. 31-32). Ms. Seales does some laundry, but her husband and her daughter help with "the bending and lifting." (Doc. 6-3, p. 33). When the ALJ asked Ms. Seales to explain her biggest problem, Ms. Seales answered that "[i]t's anything that requires the bending and lifting and just the constant movement in my arms because I can't even dry my hair without having to stop and rest two or three times because of lifting up my arms." (Doc. 6-3, p. 35). Ms. Seales stated that she can no longer bowl, garden, or play tennis. (Doc. 6-3, p. 38). Ms. Seales has trouble driving because she is "limited in the movement of [her] neck so it's very hard to . . . check [her] blind spots." (Doc. 6-3, p. 37).

Ms. Seales receives cervical blocks every four months. (Doc. 6-3, p. 38). Between the blocks, Ms. Seales testified that she loses feeling in her hands. (Doc. 6-3, p. 39). Ms. Seales takes Lortab for her pain which she claims makes her

nauseous. (Doc. 6-3, p. 39). If Ms. Seales takes Lortab and anti-nausea medicine together, then she must sleep for about an hour and a half. (Doc. 6-3, p. 39).[3]

The ALJ explained that Ms. Seales's "medically determinable impairments could reasonably have been expected to produce the alleged symptoms, but the alleged intensity, persistence, duration, and impact on functioning are not credible or consistent with the totality of the evidence." (Doc. 6-3, p. 67). The ALJ articulated explicit and adequate reasons for rejecting Ms. Seales's testimony about the severity of her back and neck pain. The ALJ rejected Ms. Seales's subjective pain testimony because he found that the testimony is inconsistent with the objective medical evidence as a whole, Ms. Seales's conservative treatment history, her activities of daily living, and her work history. Substantial evidence supports the ALJ's decision.

An ALJ may consider objective medical evidence when evaluating a claimant's subjective pain testimony. 20 C.F.R. § 404.1529(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work."). In this case, the ALJ noted that:

---

[3] Ms. Seales alleges disability "primarily due to chronic moderately severe back and neck pain." (Doc. 10, p. 5). Ms. Seales has not challenged the ALJ's conclusions regarding her other impairments. (*See* Doc. 10, pp. 5-10). Therefore, the Court considers only Ms. Seales's testimony concerning her back and neck pain and the ALJ's corresponding findings.

MRI's of [Ms. Seales's] lumbar and cervical spine do suggest foraminal and spinal stenosis. She also exhibited widespread tenderness and myofascial guarding. However, none of her records document any loss of strength, sensation, or reflexes. Further, the majority of her treatment notes indicate a normal gait and normal range of motion aside from in her lumbar and cervical spine. Moreover, pain management records and orthopedic records consistently indicated that epidural injections and pain medications largely controlled her pain, without only periodic flares of this pain noted in her records.

(Doc. 6-3, p. 69). The medical evidence supports these findings.

Ms. Seales has experienced back and neck pain since at least 2008. (Doc. 6-8, pp. 25, 27). A September 12, 2008 MRI of Ms. Seales's lumbar spine revealed mild degenerative spinal stenosis at L4-5, small left lateral disc protrusion at L3-4, and small right paracentral disc protrusion at L2-3. (Doc. 6-8, p. 30). On November 28, 2008, Ms. Seales received an epidural block at L4-5 on the right. (Doc. 6-8, p. 37).

There is more than a two-year gap between the November 2008 treatment and the next medical record documenting substantive follow-up treatment that Ms. Seales received for back and neck pain.[4] A May 9, 2011 note from a visit with Dr.

_____

[4] On June 3, 2009, Ms. Seales saw Dr. Perry Savage for upper back, lower back, and bilateral hand pain. (Doc. 6-8, p. 12). Dr. Savage assessed lumbago and recommended exercises to treat Ms. Seales's low back pain. (Doc. 6-8, pp. 12-13). On March 24, 2010, Ms. Seales saw Dr. Savage for knee, low back, and foot pain. (Doc. 6-8, p. 7). Dr. Savage diagnosed lumbago and lumbar disc degeneration, but he noted that there were "no acute changes in [Ms. Seales's] lumbar spine." (Doc. 6-8, p. 8). An April 4, 2010 treatment note states that Ms. Seales visited Dr. Savage for "a follow-up regarding her lower back and left foot." (Doc. 6-8, pp. 5-6). Dr. Savage did not make diagnoses concerning Ms. Seales's back pain during this visit; the substance of Dr. Savage's notes concerns Ms. Seales's foot injury. (Doc. 6-8, pp. 5-6).

Dewey H. Jones III at Brookwood Orthopedics indicates that Ms. Seales complained of constant back and neck pain that had worsened in the weeks before her visit. (Doc. 6-8, p. 66). Dr. Jones noted that Ms. Seales brought to the visit records from another doctor. Dr. Jones "reviewed some films that go back three or four years ago on [Ms. Seales's] neck and spine[,] but I do not know if those are reliable for today's issues." (Doc. 6-8, p. 66).

An examination revealed negative straight leg raising, and forward flexion of Ms. Seales's back "produced no unusual discomfort." (Doc. 6-8, p. 66). Dr. Jones found no scoliosis, and Ms. Seales "had good range of motion of her hips." (Doc. 6-8, p. 66). Ms. Seales had "some pain on flexion and extension of her neck and some rotation to the left and right that produced some posterior neck pain." (Doc. 6-8, p. 66).

X-rays of Ms. Seales's lumbar spine "revealed narrowing of L5-S1, otherwise, [Dr. Jones] consider[ed] them to be within normal limits." (Doc. 6-8, p. 66). Neck x-rays showed narrowing at 5-6 with "loss of normal cervical lordosis." (Doc. 6-8, p. 66). Dr. Jones found that the AP and odontoid views of Ms. Seales's neck x-rays were "within normal limits." (Doc. 6-8, p. 66).

Dr. Jones diagnosed degenerative disc disease and ordered an MRI because Ms. Seales's "back [was] the main problem." (Doc. 6-8, p. 66). Dr. Jones concluded that Ms. Seales might be a candidate for an epidural block, and he was

"not inclined to use any narcotics for any kind of issues." (Doc. 6-8, p. 66).[5]

On May 23, 2011, Ms. Seales saw Dr. Jones to discuss the results of her MRI. The MRI showed "some relative spinal stenosis and facet hypertrophy" at 4-5. (Doc. 6-8, p. 62). The MRI also revealed "some degenerative disc change" at 2-3. (Doc. 6-8, p. 62). Dr. Jones stated that he did "not consider this a surgical problem." (Doc. 6-8, p. 62). During an examination, straight leg raising was negative "but caused a little pain on the left side." (Doc. 6-8, p. 62). Dr. Jones suggested moving forward with a lumbar epidural block which Ms. Seales received on May 27, 2011. (Doc. 6-8, pp. 61-62). Dr. Jones explained that he did "not want to get in to any narcotics here." (Doc. 6-8, p. 62). Dr. Jones asked Ms. Seales to return in six weeks. (Doc. 6-8, p. 62).

Ms. Seales did not see Dr. Jones again until October 27, 2011. During this visit, she complained that pain in her "right posterior buttock and back [were] bothering her[,] but it [was] not bad enough [that] she want[ed] to do [a] block." (Doc. 6-8, p. 60). Ms. Seales also complained of pain in her neck and right arm. (Doc. 6-8, p. 60).

Ms. Seales had "some pain on flexion, extension and right lateral rotation of her neck," but her "[u]pper extremity reflexes [we]re equal." (Doc. 6-8, p. 60).

---

[5] Dr. Jones noted that Ms. Seales was receiving pain medications from other providers and expressed concern about "a lot of hydrocodone" use over the past year. (Doc. 6-8, pp. 66-67).

Lateral x-rays of Ms. Seales's cervical spine were "consistent with 5-6 narrowing." (Doc. 6-8, p. 60). The AP and odontoid views of Ms. Seales's x-ray were "within normal limits." (Doc. 6-8, p. 60). Dr. Jones noted that the pain in Ms. Seales's neck was "bad enough" that "she would consider doing an epidural block on her cervical spine." (Doc. 6-8, p. 60).

A November 21, 2011 MRI of Ms. Seales's cervical spine revealed "broad-based disc osteophyte combination with some bilateral foraminal stenosis" at C5-6. (Doc. 6-8, p. 57; *see also* Doc. 6-8, p. 58). During a November 28, 2011 visit with Dr. Jones, Ms. Seales still had "pain on extension of her neck and rotation to the right and down her right shoulder." (Doc. 6-8, p. 57). Dr. Jones noted that Ms. Seales's neck pain affected her hand. (Doc. 6-8, p. 57). Dr. Jones recommended an epidural block. (Doc. 6-8, p. 57).

On December 7, 2011, Dr. Robert Lansden performed a cervical epidural block. (Doc. 6-8, p. 55). In reviewing the history of Ms. Seales's present illness, Dr. Lansden stated that Ms. Seales had "experienced [a] 2-3 year history of slow progressive posterior cervical pain." (Doc. 6-8, p. 55). Dr. Lansden also found that "[t]here is posterior shoulder and periscapular myofascial tendency to spasm." (Doc. 6-8, p. 55). After the cervical injection, Ms. Seales rated her pain as a two out of ten. (Doc. 6-8, p. 55). Dr. Lansden noted that "[d]epending on [Ms. Seales's] progress and symptom pattern, further interventional treatment may be

offered intermittently in 2-4 months." (Doc. 6-8, p. 55).

During a follow-up appointment with Dr. Jones on December 22, 2011, Ms. Seales reported 60% improvement in her neck and shoulder pain. (Doc. 6-8, p. 54). Ms. Seales had "some discomfort on extension of her neck and rotation to the right and arm pain." (Doc. 6-8, p. 54). Ms. Seales requested another epidural block "since [the previous] one did so well." (Doc. 6-8, p. 54). Dr. Jones scheduled Ms. Seales for another block, started Mobic, and refilled a Lortab prescription. (Doc. 6-8, p. 54). Dr. Jones also set up a physical therapy evaluation. (Doc. 6-8, p. 54).

On February 2, 2012, Ms. Seales returned to see Dr. Jones and complained of "recurrent low back pain." (Doc. 6-8, p. 53). Ms. Seales still was working in the lunchroom at a school. (Doc. 6-8, p. 53). Ms. Seales's straight leg raising "produced discomfort on the right" but not on the left. (Doc. 6-8, p. 53). Dr. Jones noted that Ms. Seales's most recent MRI showed "some evidence of some lumbar spondylosis and at L4 there is disc space narrowing and degenerative changes" and hypertrophy. (Doc. 6-8, p. 53). Dr. Jones stated that he did not believe Ms. Seales's back pain required surgery. (Doc. 6-8, p. 53). Dr. Jones noted that "at this point in time, I think [Ms. Seales] has got discomfort in her lower back." (Doc. 6-8, p. 53). Dr. Jones cautioned that he did not like to administer more than three to four epidural blocks in a year and that Ms. Seales should not manage her

pain with narcotics.  (Doc. 6-8, p. 53).  Dr. Jones commented that pain management may be an option to treat Ms. Seales's pain.  (Doc. 6-8, p. 53).

On February 2, 2012, Dr. Lansden administered another cervical epidural injection.  (Doc. 6-9, p. 50).  At the conclusion of the procedure, Ms. Seales stated that her pain was reduced from a five to a two out of ten.  (Doc. 6-9, p. 50).  On March 6, 2012, Ms. Seales saw Dr. Lansden again.  (Doc. 6-9, p. 41).  Dr. Lansden noted that the Ms. Seales's epidural therapy had "moderately" helped her pain, but she was having a flare-up of her cervical and shoulder pain.  (Doc. 6-9, p. 41).  Ms. Seales still was working in the cafeteria at a local school, but she had been off for two weeks prior to her March 6, 2012 visit with Dr. Lansden.  (Doc. 6-9, p. 41).

During an examination, Ms. Seales's cervical posture was symmetrical, and she was able to rotate 75 to 80 degrees to the left and 60 degrees to the right.  (Doc. 6-9, p. 41).  Dr. Lansden noted "[d]iffuse paracervical and periscapular myofascial guarding," but Ms. Seales had "[n]o tissue effusion" and "[f]ull shoulder range of motion with provocation."  (Doc. 6-9, p. 41).  Ms. Seales's lumbar posture was symmetrical, but she experienced "[d]iffuse myofascial guarding in the low back and upper gluteal region along the trochanteric bursa."  (Doc. 6-9, p. 41).  Dr. Lansden diagnosed cervical disc degeneration and spondylosis, lumbar disc degeneration with L4/5 stenosis, cervicalgia, lumbar neuralgia, and fibromyalgia. (Doc. 6-9, p. 41).

Dr. Lansden stated that because of Ms. Seales's fibromyalgia, she should "re-introduce an exercise program with lots of stretching and perhaps water based therapy." (Doc. 6-9, p. 41). Dr. Lansden noted that Ms. Seales stated that she "felt better when she was doing her work out last year." (Doc. 6-9, p. 41). Dr. Lansden explained that Ms. Seales understood that he "want[ed] to stay conservative" with treatment and that Ms. Seales could have "intermittent epidural treatments depending on [the] flare-up pattern." (Doc. 6-9, p. 42).

On April 26, 2012, Ms. Seales complained to Dr. Jones that her pain was "just a little more constant than it usually is" and worse when sitting. (Doc. 6-8, p. 52). Dr. Jones's notes state that Ms. Seales still worked "in the lunchroom doing a lot of things." (Doc. 6-8, p. 52). Dr. Jones noted that Ms. Seales "had a block a couple of months back and it seemed to help her." (Doc. 6-8, p. 52). Straight leg raising on the right was "somewhat uncomfortable," and Dr. Jones explained that Ms. Seales may have some sciatic irritation. (Doc. 6-8, p. 52). Dr. Jones found that "there may be equivocal sensory changes in the right lower extremity," but on the left side, "[s]ymptoms were minimal." (Doc. 6-8, p. 52). Dr. Jones ordered an updated MRI and concluded that Ms. Seales's treatment may be "a matter of just doing more pain management or blocks as needed." (Doc. 6-8, p. 52). Dr. Jones noted that Ms. Seales was "under pain management by Dr. Lansden." (Doc. 6-8, p. 52).

On May 2, 2012, Ms. Seales saw Dr. Jones and complained that she had been experiencing "constant pain." (Doc. 6-8, p. 43). Ms. Seales told Dr. Jones that she was not getting relief from pain management therapy. (Doc. 6-8, p. 43). Dr. Jones found that Ms. Seales's most recent MRI was "unchanged from May of last year." (Doc. 6-8, p. 43). Ms. Seales had an antalgic gait. (Doc. 6-8, p. 43). Ms. Seales "wanted to know about putting in for disability," and Dr. Jones told her "that may be a possibility." (Doc. 6-8, p. 43).

On May 10, 2012, Ms. Seales saw Dr. Lansden and reported that a March 23, 2012 cervical epidural provided "significant relief for one month." (Doc. 6-9, p. 32). Dr. Jones noted that Ms. Seales's "primary complaint has been low back related [pain] radiating primarily down her right lower extremity." (Doc. 6-9, p. 32). Ms. Seales reported that when taking hydrocodone, her "discomfort will go down to approximate[ly] 4 out of 10." (Doc. 6-9, p. 32). Dr. Lansden told Ms. Seales that her narcotic therapy was designed "to preserve functionality with improved pain control for reasonable task performance and [wa]s not likely to give complete relief." (Doc. 6-9, p. 32). Dr. Lansden refilled Ms. Seales's Lortab prescription, increased her Cymbalta dosage, and instructed her to follow-up in three months. (Doc. 6-9, p. 32).

On August 2, 2012, Dr. Lansden noted that Ms. Seales had not had a "substantial flare-up since her cervical epidural" on June 27, 2012. (Doc. 6-9, p.

17).  Dr. Lansden explained that Ms. Seales's "lumbar issues remain[ed] stable," but there was some "mild discomfort in [her] right hip, particularly with standing and ambulation."  (Doc. 6-9, p. 17).  Dr. Lansden noted that Ms. Seales was working at a local pool for the summer.  (Doc. 6-9, p. 17).  Ms. Seales had diffuse myofascial guarding in the mid to lower lumbar segments and some tenderness, but her examination revealed symmetrical alignment and posture, full range of motion in her shoulders, and 70 to 80 degrees rotation.  (Doc. 6-9, p. 17).  Dr. Lansden stated that Ms. Seales was "doing well on [a] conservative amount of medication and is attending to her exercise and stretch efforts" and that "[h]er cervical pain has been fairly manageable with medications and stretch exercises."  (Doc. 6-9, p. 17). Dr. Lansden noted that Ms. Seales "may need epidural therapy" as needed "depending on flare-up pattern."  (Doc. 6-9, p. 17).

Ms. Seales visited Dr. Lansden again on October 25, 2012.  Dr. Lansden noted that Ms. Seales's back pain was better, but her hip "continued to have constant, deep aching" pain.  (Doc. 6-9, p. 9).  Dr. Lansden explained that Ms. Seales was "doing well overall with exercise, stretching[,] and conservative use of analgesics." (Doc. 6-9, p. 9).  Dr. Lansden commented that Ms. Seales was dealing with "a lot of personal stress," and he recommended a support program.  Dr. Lansden arranged for another cervical epidural.  (Doc. 6-9, p. 9).

Ms. Seales saw Dr. Lansden again on January 31, 2013 for a three month

interval assessment. (Doc. 6-9, p. 2). Dr. Lansden noted that Ms. Seales had received a cervical epidural in December, and the epidural provided "significant relief." (Doc. 6-9, p. 2). Dr. Lansden characterized Ms. Seales's cervical pain as "fairly manageable," and noted that Ms. Seales's low back pain was "fairly stable." (Doc. 6-9, p. 2). Ms. Seales was "doing well on her medications without notable adverse effects or compliance issues." (Doc. 6-9, p. 2). According to Dr. Lansden, Ms. Seales did not require "interventional treatment" because Ms. Seales had a favorable response to cervical treatment the month before. (Doc. 6-9, p. 2).

On April 25, 2013, Dr. Lansden noted that an April 10, 2013 lumbar epidural "resulted in significant improvement of [Ms. Seales] low back pain." (Doc. 6-11, p. 16). Four months had passed since Ms. Seales received treatment for her cervical pain, and her "cervical discomfort [wa]s progressing." (Doc. 6-11, p. 16). Ms. Seales had diffuse myofascial guarding and some "mild tenderness over the right trochanteric region and fascialata." (Doc. 6-11, p. 16). Otherwise, her examination was normal. Dr. Lansden refilled Ms. Seales's prescription medication because it was "relatively effective with stated benefit." (Doc. 6-11, p. 16).

When Ms. Seales saw Dr. Lansden on July 17, 2013, she continued to experience a "significant benefit" from a cervical epidural that she received on May 1, 2013. (Doc. 6-11, p. 7). Ms. Seales's cervical pain was "manageable"

after the epidural, but she experienced "[i]ncreasing lumbar pain" on her right side. (Doc. 6-11, p. 7).   During this visit, Dr. Lansden increased Ms. Seales's pain medication and "strongly encouraged water exercise and stretching."   (Doc. 6-11, p. 7).   Dr. Lansden stated that he would try to schedule Ms. Seales for an epidural treatment in the coming weeks.   (Doc. 6-11, p. 7).

On October 10, 2013, Dr. Lansden saw Ms. Seales for a follow-up appointment.   (Doc. 6-11, p. 61).   Dr. Lansden stated that Ms. Seales received a cervical epidural on July 31, 2013 "which provided significant relief with some mild to moderate recurrence."   (Doc. 6-11, p. 61).   Ms. Seales requested another lumbar injection because she was experiencing pain "into the right buttock, thigh, usually to the knee level, occasionally extending to her calf;" she had not had a lumbar epidural since April 2013.  (Doc. 6-11, p. 61).   Dr. Lansden noted that Ms. Seales "overall [wa]s doing well with her medications and intermittent epidural treatments."  (Doc. 6-11, p. 62).

On January 20, 2014, Dr. Jones treated Ms. Seales for neck, hip, thumb, and knee pain.  (Doc. 6-11, p. 71).   Ms. Seales reported that a December 2013 cervical block "did not really have much of an [e]ffect."   (Doc. 6-11, p. 71).   Ms. Seales reported that she experienced pain in her hip "going up and down steps" and "stooping and squatting."   (Doc. 6-11, p. 71).   Ms. Seales's hip examination was "benign except for some retropatellar tenderness bilaterally."   (Doc. 6-11, p. 71).

X-rays of Ms. Seales's thumb, hip, and knees produced normal images. (Doc. 6-11, p. 71). Ms. Seales received a thumb and hip injection, and Dr. Jones noted that Ms. Seales "has a disc problem in the cervical spine." (Doc. 6-11, p. 72).

On February 3, 2014, Ms. Seales told Dr. Lansden that a December 2013 cervical epidural provided "moderate benefit in her cervical and shoulder pattern distribution." (Doc. 6-11, p. 47). Ms. Seales reported that she experienced "some burning sensations with activities," but she was performing her "stretching related exercises" fairly routinely. (Doc. 6-11, p. 47). Dr. Lansden noted that Ms. Seales's "medications are relatively effective and beneficial for pain management." (Doc. 6-11, p. 48). Ms. Seales experienced no "adverse effects or compliance issues." (Doc. 6-11, p. 48). Dr. Lansden explained that Ms. Seales "may need interventional treatment intermittently for pain flareup[s]." (Doc. 6-11, p. 48).

On February 28, 2014 and March 31, 2014, Ms. Seales saw Dr. Cornelius Thomas upon referral from Dr. Jones. (Doc. 6-11, p. 64; Doc. 6-12, p. 5). Dr. Thomas is a rheumatologist. Dr. Thomas noted Ms. Seales's history of degenerative disc disease and fibromyalgia. (Doc. 6-11, p. 64; Doc. 6-12, p. 5). Ms. Seales complained of swelling in her knees, but pain in her "back, shoulders, arms, and feet" was her worst symptom. According to Ms. Seales, foot tenderness limited her ability to walk. (Doc. 6-11, p. 64; Doc. 6-12, p. 5). During an examination, Ms. Seales's cervical spine and hips had a normal range of motion.

(Doc. 6-11, p. 65; Doc. 6-12, p. 7). Dr. Thomas noted "decreased lumbar flexion, mildly with discomfort." (Doc. 6-11, p. 65; Doc. 6-12, p. 7). Ms. Seales had tenderness in her feet, neck, lower back, shoulders, hips, and lower legs, but she had no swollen joints. (Doc. 6-11, p. 65; Doc. 6-12, p. 7). Dr. Thomas diagnosed fibromyalgia and spondylosis. (Doc. 6-11, p. 65; Doc. 6-12, p. 8). Dr. Thomas prescribed medication and encouraged Ms. Seales to exercise. (Doc. 6-11, p. 65; Doc. 6-12, p. 8).

The objective medical evidence supports Ms. Seales's contention that she "may have obtained relief for short periods of time from the epidurals," but "she was never pain free." (Doc. 10, p. 9). Whether Ms. Seales ever was pain free is not the relevant inquiry. Instead, the question is whether the objective medical evidence supports Ms. Seales's testimony about the limiting effects of her pain. Although Ms. Seales did not respond to treatment prior to 2008 (*see* Doc. 6-8, p. 27), throughout her treatment with various providers from 2011 through 2014, Ms. Seales experienced relief from epidural blocks and injections. When the blocks wore off, Ms. Seales reported pain flare-ups that doctors determined responded well to medication and injection therapy. Ms. Seales's physicians recommended conservative narcotic prescription treatment, and no provider recommended surgery for her back and neck pain. *See Crow v. Comm'r of Soc. Sec. Admin.*, 571 Fed. Appx. 802, 805, 808 (11th Cir. 2014) (substantial evidence supported ALJ's

adverse credibility finding where the claimant's "treatment was largely medication management, with few, if any, recommendations for more aggressive treatment" and the claimant's treating physician did not indicate any significant physical limitations).

Ms. Seales was working through much of her treatment, and her doctors routinely recommended exercise. Ms. Seales argues that the ALJ improperly relied on these recommendations because "[i]t is impossible to decipher what her treating physicians felt she was able to do in the form of exercise." (Doc. 10, p. 11). The fact remains that Ms. Seales's treating physicians did not qualify with limitations their recommendations that Ms. Seales exercise. Moreover, in the months before and after her alleged onset date, Ms. Seales's physicians did not advise her to refrain from physical activity or work.

The ALJ thoroughly reviewed the objective medical evidence (Doc. 6-3, pp. 67-70), and substantial evidence supports the ALJ's conclusion that the objective medical evidence does not fully support the severity of Ms. Seales's alleged functional limitations. *See e.g., Duval v. Comm'r of Soc. Sec.*, 628 Fed. Appx. 703, 712 (11th Cir. 2015) ("The ALJ explained that Mr. Duval's testimony was not credible to the extent it was unsupported by the objective medical evidence. . . . From this discussion, we can clearly infer what testimony from Mr. Duval the ALJ found lacking in credibility and why it was discredited."); *Eckert v. Comm'r of*

*Soc. Sec.*, 152 Fed. Appx. 784, 791 (11th Cir. 2005) ("[T]he credible medical evidence, as found by the ALJ, did not confirm the severity of the alleged pain and the objectively determined medical condition was not of such a severity that it can reasonably be expected to give rise to the alleged pain.").

In evaluating Ms. Seales's subjective pain testimony, the ALJ also examined Ms. Seales's demeanor and activities of daily activity. (Doc. 6-3, pp. 69-70). The ALJ observed that during her administrative hearing, Ms. Seales was "casual and comfortable with no outward signs of pain." (Doc. 6-3, pp. 69-70); *see Sampson v. Comm'r of Soc. Sec.*, --- Fed Appx. ----, 2017 WL 2982965, at *10 (11th Cir. July 13, 2017) (an ALJ may consider the claimant's demeanor at the hearing but may not reject medical evidence or testimony based solely upon an observation made at the hearing) (citing *Norris v. Heckler*, 760 F.2d 1154, 1158 (11th Cir. 1985)).

Regarding Ms. Seales's daily activities, the ALJ noted that Ms. Seales was capable of walking up to half a mile, driving, going to sports events, shopping multiple times per week, performing household chores, and mowing the lawn. (Doc. 6-3, p. 70). In addition, the ALJ noted that Ms. Seales "remained able to work with [her] impairments, including epidural injections for her pain, for 2-4 years prior to her alleged onset date." (Doc. 6-3, p. 69). Ms. Seales also worked at a local pool following her alleged onset date. (Doc. 6-3, p. 70; *see* Doc. 6-9, p. 17).

The Eleventh Circuit has noted that "participation in everyday activities of short duration" does not necessarily disqualify a claimant from disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). But the regulations expressly permit an ALJ to consider a claimant's activities of daily living when assessing a claimant's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529(c)(2)(3), 416.929(c)(2)(3). Ms. Seales contends that her "daily activities are not as substantial as the ALJ claimed" and that the "ALJ ignored the limitations" about which she testified. (Doc. 10, p. 12).

In a function report that she completed on March 11, 2013, Ms. Seales noted that she was capable of performing the following activities as part of her daily routine:

> Wake up at 6:45 A.M. Due to the arthritis in feet it takes about 10 minutes to get around. Wake up daughter, I eat early due to diabetes, make daughter breakfast, let dog out, start laundry, take her to school, do household chores, eat lunch, do any errands if needed, pick up daughter from school, start preparing dinner, take daughter to soccer practice, eat dinner, clean kitchen, pick daughter up, get shower, bed at 10:30 P.M.

(Doc. 6-7, p. 26). Ms. Seales reported limitations in lifting and bending. (Doc. 6-7, pp. 27-28). Ms. Seales reported that she goes outside four to five times daily. (Doc. 6-7, p. 29). She also reported that on a regular basis, she attends her daughter's and grandson's soccer games, church, and family gatherings. (Doc. 6-7, p. 30). In the same report, Ms. Seales explained that "many days [she does not]

go anywhere due to hurting all over or just [being] fatigued" (Doc. 6-7, p. 31), but on April 25, 2013, Dr. Lansden noted that Ms. Seales was "fairly active at home" and "attend[ed] her children's sports events." (Doc. 6-11, p. 9). The ALJ properly evaluated Ms. Seales's daily activities, and he expressly incorporated into his RFC limitations that account for Ms. Seales's testimony that she has trouble reaching and lifting. (*See* Doc. 6-3, p. 70). The Court finds no reversible error in the ALJ's consideration of Ms. Seales's activities of daily living. *See Carman v. Astrue*, 352 Fed. Appx. 406, 408 (11th Cir. 2009) ("The ALJ articulated various inconsistencies in Carman's evidence that a reasonable person could conclude supported the ALJ's finding that Carman's subjective complaints of pain were not entirely credible.").

The Court is not persuaded by Ms. Seales's argument concerning the ALJ's characterization of Dr. Jones's statement regarding the possibility of disability. (*See* Doc. 10, p. 10). According to Dr. Jones's May 2, 2012 treatment notes, Ms. Seales "wanted to know about putting in for disability," and Dr. Jones told her "that may be a possibility." (Doc. 6-8, p. 43). The ALJ explained that he gave "some weight" to this statement because it "not[ed] only a possibility of disability, rather than explicitly indicating that [Ms. Seales] was disabled." (Doc. 6-3, p. 70).

Dr. Jones's statement is not as persuasive as Ms. Seales suggests. First, it is unclear from Dr. Jones's statement whether he provided an opinion regarding

disability; he did not state unequivocally that Ms. Seales is disabled. Second, assuming that the statement is an opinion that Ms. Seales possibly is disabled, the ALJ correctly noted that determination of disability is an issue reserved for the Commissioner. 20 C.F.R. § 404.1527(d). Therefore, a physician's opinion that a claimant is disabled is not a medical opinion requiring a heightened degree of review, and the regulations do "not give any special significance to the source of [the] opinion." 20 C.F.R. § 404.1527(d)(3).

In reviewing the available evidence in the record, the Court cannot find that the ALJ was "clearly wrong to discredit" Ms. Seales's testimony. *See Werner v. Comm'r of Soc. Sec.*, 421 Fed. Appx. 935, 939 (11th Cir. 2011). Rather, Ms. Seales's medical evidence, treatment history, and daily activities support the ALJ's evaluation of her subjective complaints of pain. *Foote*, 67 F.3d at 1562 ("A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court."); *Brown v. Comm'r of Soc. Sec.*, 442 Fed. Appx. 507, 513-14 (11th Cir. 2011) (the ALJ sufficiently assessed the credibility of the claimant's testimony where the ALJ thoroughly discussed the claimant's allegations in light of the record of a whole).

## V.  CONCLUSION

For the reasons discussed above, the Court finds that the ALJ's decision is supported by substantial evidence, and the ALJ applied proper legal standards.

The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

DONE and ORDERED this September 8, 2017.

MADELINE HUGHES HAIKALA
UNITED STATES DISTRICT JUDGE